[Cite as *State v. Acy*, 2025-Ohio-2482.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO, | : | | |
| Appellee, | : | CASE NOS. | CA2024-11-078 |
| | : | | CA2024-11-079 |
| - vs - | : | OPINION AND | |
| | : | JUDGMENT ENTRY | |
| | | 7/14/2025 | |
| STEPHEN ACY, | : | | |
| Appellant. | : | | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case Nos. 23CR40964 and 24CR41491

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant.

## O P I N I O N

**HENDRICKSON, P.J.**

{¶ 1}  Appellant, Stephen Acy, appeals from his conviction and sentence in the Warren County Court of Common Pleas after a jury found him guilty of assault and harassment with a bodily substance. For the reasons set forth below, we affirm his

conviction and sentence.

{¶ 2} On September 18, 2023, Acy, an inmate at the Lebanon Correctional Institute ("LCI"), was indicted in Case No. 23CR40964 on one count of assault and one count of harassment with a bodily substance. The charges of the September 2023 indictment arose from allegations that on July 5, 2023, Acy struck Corrections Officer ("C.O.") Kenneth Place in the face, and on July 14, 2023, Acy threw a cup containing bodily fluids at C.O. Dillian Jones. Acy pled not guilty to the charges.

{¶ 3} On March 4, 2024, Acy was indicted in Case No. 24CR41491 on four counts of harassment with a bodily substance, three of which arose out of allegations that, on July 26, 2023, Acy splashed urine onto C.O. Robert Magyar, Captain Derri Cantlope, and a nurse from LCI. The remaining count of harassment with a bodily substance stemmed from allegations that Acy threw feces on C.O. David Rettig on December 22, 2023. Acy pled not guilty to the charges.

{¶ 4} On August 13, 2024, in Case No. 23CR40964, Acy moved to sever the counts of the September 2023 indictment into separate trials, one trial for the assault charge and one trial for the harassment with a bodily substance charge. That same day, in Case No. 24CR041491, Acy moved the trial court to sever the counts of the March 2024 indictment into two separate trials, one trial for the three harassment with a bodily substance charges that stemmed from his conduct on July 26, 2023, and one trial for the remaining harassment with a bodily substance charge that arose from his conduct on December 22, 2023.

{¶ 5} On August 28, 2024, the trial court denied Acy's motion in Case No. 23CR40964. While Acy's motion remained pending in Case No. 24CR41491, the State moved to join the two indictments for trial pursuant to Crim.R. 8 and Crim.R. 13. Acy

opposed the State's motion and incorporated the arguments he raised in his August 2023 motion for separate trials. On October 28, 2024, the trial court issued an order and entry denying Acy's motion for separate trials in Case No. 24CR41491 and granting the State's motion for joinder.

{¶ 6} After the two indictments were joined, the matter proceeded to a two-day jury trial on November 13, 2024. At trial, the State presented testimony from several witnesses, including C.O. Place, C.O. Jones, C.O. Magyar, Captain Cantlope, C.O. Rettig, and the nurse from LCI. During the presentation of the State's case, each of the above witnesses detailed his or her encounter with Acy at LCI.

{¶ 7} Beginning with C.O. Place, the officer testified that he was working at LCI on July 5, 2023. That day, C.O. Place was responsible for transporting Acy from the restrictive housing unit to the shower for processing. This transportation process involves uncuffing the inmate to remove his or her clothing. Once C.O. Place uncuffed one of Acy's hands, Acy reached through the bars of the shower and punched C.O. Place in the face with a closed fist. A video recording of the incident was played for the jury at trial and admitted into evidence.

{¶ 8} C.O. Jones testified next, and stated that on July 14, 2023, he was assigned as a block officer in the segregation unit of LCI, which included Acy's cell at that time. That day, LCI was operating under a heat protocol, during which corrections officers provided ice to the inmates. After receiving permission to provide Acy with ice, C.O. Jones approached Acy's cell and proceeded to open the cuff port. When C.O. Jones opened the cuff port to Acy's cell, Acy grabbed a container filled with yellow liquid and threw it through the cuff port toward C.O. Jones. Although C.O. Jones jumped back, he was hit with the liquid on his shirt, arm, and cheek. Video recordings of the incident were played for the

jury at trial and admitted into evidence.

{¶ 9} After the incident, C.O. Jones' shirt was collected as evidence and submitted to the Ohio Bureau of Criminal Investigations ("BCI") for testing. The testing at BCI revealed that the substance appeared in a speckled pattern, which could be consistent with a sneeze or cough, and that it was presumptively positive for amylase, which is most abundant in saliva. The substance on C.O. Jones' shirt tested negative for urine or semen.

{¶ 10} Captain Cantlope testified that on July 26, 2023, he was employed at LCI as a lieutenant. That day, he assisted with a "med pass" in the segregation block, during which he and C.O. Magyar accompanied an LCI nurse while she disbursed medication to Acy in his cell. After the nurse gave Acy his medication, Acy proceeded to splash a bag full of liquid that smelled like urine through the cuff port toward C.O. Magyar's face. The liquid hit C.O. Magyar in the chest and face and splashed into his mouth. The liquid also splashed onto Captain Cantlope's arm and the nurse "felt a little something on [her] left hand." Video recordings of the incident were played for the jury at trial and admitted into evidence.

{¶ 11} After the incident, C.O. Magyar's shirt was collected as evidence and submitted to BCI for testing. Pursuant to the BCI testing, C.O. Magyar's shirt tested presumptively positive for creatine, which is excreted through urine.

{¶ 12} C.O. Rettig testified next, and stated that on December 22, 2023, he was responsible for retrieving Acy's meal tray. When C.O. Rettig went to Acy's cell to retrieve the meal tray, Acy put his hand through the cuff port and "splattered" "a cup of urine and feces . . . all over" C.O. Rettig. The substance hit C.O. Rettig in the face, mouth, jacket, and pants. Video recordings of the incident were played for the jury at trial and admitted

into evidence.

{¶ 13} After the incident, C.O. Rettig's pants were collected as evidence and submitted to BCI for testing. The BCI testing revealed that urobilinogen, an enzyme found in feces, urine, and blood, was present in the substance located on C.O. Rettig's pants.

{¶ 14} Acy testified in his defense. During his testimony, Acy denied throwing any bodily substances at the corrections officers or the LCI nurse and denied that he assaulted C.O. Place. Acy offered his version of events for each of the four encounters, and explained he only threw water and mashed up food at the officers.

{¶ 15} Regarding the 2023 indictment, the jury found Acy guilty on Count 1, the assault of C.O. Place, but not guilty on Count 2, the harassment with a bodily substance charge pertaining to C.O. Jones. The jury further found Acy guilty on Counts 1 and 4 of the 2024 indictment, the harassment with a bodily substance charges pertaining to C.O. Magyar and C.O. Rettig. The jury found Acy not guilty of the remaining two counts of the 2024 indictment, the harassment with a bodily substance charges pertaining to Captain Cantlope and the LCI nurse.

{¶ 16} The trial court sentenced Acy to six months in prison for each of the harassment with a bodily substance charges and nine months in prison for the assault charge. The court ordered the harassment charges to run concurrent with one another, but consecutive to the prison term imposed for the assault charge. Thus, the trial court sentenced Acy to an aggregate prison term of 15 months, which was ordered to run consecutively to the term Acy was currently serving at LCI.

{¶ 17} Acy now appeals, raising two assignments of error for this court's review.

{¶ 18} Assignment of Error No. 1:

{¶ 19} THE TRIAL COURT ERRED WHEN IT OVERRULED ACY'S MOTION FOR

SEPARATE TRIALS ON THE TWO INDICTMENTS.

{¶ 20} In his first assignment of error, Acy argues the trial court erred by denying his request for separate trials and claims he was prejudiced by the trial court's decision.

{¶ 21} The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character. *State v. Wilkins*, 2008-Ohio-2739, ¶ 13 (12th Dist.). Under Crim.R. 13, a "trial court may order two or more indictments or informations or both to be tried together, if the offenses . . . could have been joined in a single indictment or information." *Id.* "However, a defendant is allowed, under Crim.R. 14, to move to sever offenses that have otherwise been properly joined where it appears that joinder would be prejudicial." *State v. Ashcraft*, 2009-Ohio-5281, ¶ 14 (12th Dist.).

{¶ 22} The decision to grant or deny a motion to sever is a matter left to the trial court's discretion. *State v. Thompson*, 2023-Ohio-559, ¶ 23 (12th Dist.). Given the discretion afforded to the trial court, this court will generally review a trial court's decision to grant or deny a motion to sever under an abuse of discretion standard. *State v. Workman*, 2017-Ohio-8638, ¶ 74 (12th Dist.). However, where a defendant files a motion to sever but then fails to renew the motion at the close of either the State's case or presentation of all evidence, such as the case here, the defendant waives all but plain error on appeal. *Thompson* at ¶ 23, citing *State v. Moshos*, 2010-Ohio-735, ¶ 77 (12th Dist.). "Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings." *State v. Buell*, 2022-Ohio-3102, ¶ 16 (12th Dist.), citing *State v. Barnes*, 2002-Ohio-68, ¶ 20.

{¶ 23} To prevail on a claim that the trial court erred in denying a motion to sever, the appellant must affirmatively demonstrate: "(1) his rights were prejudiced, (2) he provided the trial court with sufficient information enabling it to weigh the consideration

favoring joinder against the defendant's right to a fair trial, and (3) the trial court abused its discretion in refusing to separate the charges for trial." *Workman* at ¶ 75.

{¶ 24} While the defendant bears the burden of proving prejudicial joinder, the State may rebut the defendant's claim by utilizing one of two methods. *State v. Holloway*, 2024-Ohio-3360, ¶ 37 (12th Dist.), citing *Ashcraft*, 2009-Ohio-5281 at ¶ 16 (12th Dist.). These two methods are known as the "other acts test" and the "joinder test." *See Workman* at ¶ 76. The "other acts test" requires the State to demonstrate that it could have introduced evidence of the joined offenses at separate trials pursuant to the "other-acts" provision set forth in Evid.R. 404(B). *State v. Hensley*, 2010-Ohio-3822, ¶ 40 (12th Dist.). On the other hand, the "joinder test" requires the State to demonstrate that evidence of each crime joined at trial is "simple and direct." *State v. Matthews*, 2013-Ohio-3482, ¶ 38 (12th Dist.). "'If the State can meet the joinder test, it need not meet the stricter 'other acts' test.'" *Moshos*, 2010-Ohio-735 at ¶ 79, quoting *State v. Johnson*, 2000-Ohio-276. That is to say, "[a] showing by the State that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper." *State v. Bice*, 2009-Ohio-4672, ¶ 53 (12th Dist.). "'[A]n accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B).'" *State v. Hall*, 2022-Ohio-1147, ¶ 216 (12th Dist.), quoting *State v. Franklin*, 62 Ohio St. 3d 118, 122 (1991).

{¶ 25} In this case, Acy argues the trial court erred in denying his motion for separate trials "because many of the charges are similar in nature," and therefore, "the jury would tend to apply evidence from one, completely unrelated case, to another." Acy claims this is especially true in this case, where the underlying nature of the crime involves human waste coming into contact with state employees. We disagree.

{¶ 26} After a thorough review of the record, we find the evidence relating to each of the charges levied against Acy was simple and direct, thereby satisfying the joinder test set forth above. In its opening statement, the State summarized the charges against Acy as follows:

> [Acy] is charged with one count of assault for punching CO Place on July 5th. One count of harassment with a bodily substance for throwing the bodily fluid on Corrections Officer Jones on July 14th. Three counts of harassment with a bodily substance for throwing urine on CO Magyar, Lieutenant Cantlope, and [the] nurse . . . on July 26th. And one count of harassment for throwing feces on CO Rettig on December 22nd of 2023.

Thus, the State made clear, at the outset of trial, that the six charges of the indictments involved six different victims and occurred on four different dates.

{¶ 27} Additionally, the testimony elicited by the State was largely presented to the jury with victim specific witnesses, who each testified as to their encounters with Acy at LCI. This method ensured that the evidence elicited by the State as to each of the six offenses remained separate and distinct from one another. This presentation method also made it very unlikely that the jury would be confused by which of the six charges went with which of Acy's six alleged victims. The same is true for the testimony presented by the State regarding the testing done by BCI. During their testimonies, the BCI forensic scientists specifically identified the item of clothing he or she tested, and to whom the item of clothing belonged. Like the testimony from the victims, this presentation tactic made it unlikely the jury would be confused regarding which officer's clothing tested positively for bodily fluids.

{¶ 28} Furthermore, the parties agreed that the jury instructions should identify the State's alleged victim in the instruction on each count "so that it was clear which count related to which alleged victim." The record reflects such instructions were provided in

this case, and that the jury instructions identified the specifics of each alleged offense, as well as the alleged victim for each count. It is presumed that the jury followed the trial court's instructions. *Thompson*, 2023-Ohio-559 at ¶ 26.

{¶ 29} Lastly, the record does not support Acy's contention that he was prejudiced by the court's decision to join the two indictments for trial. That is, there is no indication from the record that the jury confused the evidence as to the different counts or that it was influenced by the cumulative effect of the joinder. Instead, the jury's not guilty verdicts on several counts, but guilty verdicts on others, indicates the jury considered each charge separately.

{¶ 30} Based upon the foregoing, we find the trial court did not err in denying Acy's request for separate trials where the evidence concerning each offense was separate and distinct, and simple and direct. Accordingly, Acy's first assignment of error is overruled.

{¶ 31} Assignment of Error No. 2:

{¶ 32} THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES.

{¶ 33} In his remaining assignment of error, Acy contends the trial court erred in imposing consecutive sentences

{¶ 34} A felony sentence is reviewed under the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 1. R.C. 2953.08(G)(2) states that an appellate court may modify or vacate a sentence if the court finds "by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Id.*

{¶ 35} When imposing consecutive sentences, a sentencing court is required "to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and

- 9 -

incorporate its findings into its sentencing entry." *State v. Bonnell*, 2014-Ohio-3177, syllabus. Specifically, the sentencing court must find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) that one of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 36} In this case, it is undisputed that the trial court included all the necessary findings to support the imposition of consecutive sentences in its sentencing entry. However, Acy argues the trial court failed to address the third requirement of R.C. 2929.14(C)(4)–that a finding be made pursuant to subsection (C)(4)(a), (b), or (c)–at the sentencing hearing. After our review of the record, we find no merit to Acy's claim.

{¶ 37} It is well settled that, although a trial court must make the required findings at the sentencing hearing, "a word-for-word recitation of the language of the statute is not required." *Bonnell* at ¶ 29. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *State v. Brotherton*,

- 10 -

2024-Ohio-5045, ¶ 32-34 (12th Dist.), citing *Bonnell* at ¶ 29. Thus, "the relevant inquiry here is not whether the trial court used the 'magic' words in imposing consecutive sentences, but whether the trial court engaged in the appropriate analysis." *State v. Wati*, 2019-Ohio-4827, ¶ 15 (12th Dist.).

{¶ 38} In this case, the trial court stated the following regarding its imposition of consecutive sentences:

> I'll give you the basis for the consecutive sentence, but it would be - - it would be no deterrent affect (sic) whatsoever [if] he got concurrent time while he's in prison for something that he did in prison. I find that consecutive sentences in this case of the nine and six months are necessary in order to punish and protect the public from future crime and are not disproportionate to the conduct or danger posed by the Defendant. This could have gone much worse.

Based upon this language, it is evident the trial court engaged in the correct analysis when imposing consecutive sentences. Specifically, we can discern from the court's statements that it found, pursuant to R.C. 2929.14(C)(4)(c), that Acy's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.[1]

{¶ 39} Regarding Acy's criminal history, the trial court discussed that Acy committed the instant offenses while incarcerated for multiple other crimes, and indicated that deterrence from further criminal activity was a necessary component to Acy's sentence. The court's discussion of a deterrent effect, which it found could only be achieved through the imposition of consecutive sentences, reflects the court's finding that consecutive sentences are necessary to protect the public from future crime by Acy.

---

1. This finding is consistent with the court's sentencing entry, in which it found that Acy's history demonstrates that consecutive sentences are necessary to protect the public from future crime by Acy. It is also consistent with the purpose of R.C. 2929.14(C)(4)(c), which contemplates the likelihood of recidivism based upon the offender's criminal history and the deterrent effect as to a particular offender. *State v. Halbert*, 2023-Ohio-4471, ¶ 37 (12th Dist.); *State v. Elmore*, 2016-Ohio-890, ¶ 57 (7th Dist.).

While we acknowledge that the trial court's third finding is not a perfect recitation of R.C. 2929.14(C)(4)(c), a word-for-word recitation is not required by Ohio law. *Bonnell*, 2014-Ohio-3177 at ¶ 29. As such, we find the trial court's findings during the sentencing hearing adequately complied with R.C. 2929.14(C)(4)(c).

**{¶ 40}** Accordingly, we find the record establishes the trial court engaged in the appropriate analysis pursuant to R.C. 2929.14(C) at the sentencing hearing and that it made the appropriate findings in accordance with R.C. 2929.14(C)(4). Therefore, Acy's second assignment of error is overruled.

**{¶ 41}** Judgment affirmed.


M. POWELL and SIEBERT, JJ., concur.


## J U D G M E N T   E N T R Y


The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.


/s/ Robert A. Hendrickson, Presiding Judge


/s/ Mike Powell, Judge


/s/ Melena S. Siebert, Judge